**Electronically Filed
Intermediate Court of Appeals
CAAP-12-0000794
17-AUG-2015
08:05 AM**

CAAP-12-0000794

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee,
v.
ZALDY SUBIA, Defendant-Appellant.


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 11-1-1405)


MEMORANDUM OPINION
(By: Nakamura, C.J., and Reifurth and Ginoza, JJ.)


Plaintiff-Appellee State of Hawai'i (State) charged Defendant-Appellant Zaldy Subia (Subia) with second-degree methamphetamine trafficking, in violation of Hawaii Revised Statutes (HRS) § 712-1240.8 (2014).[1] Subia's prosecution stemmed from his engaging in a drug transaction with an undercover police officer. A jury found Subia guilty as charged. The Circuit Court of the First Circuit (Circuit Court)[2] sentenced Subia to ten years of imprisonment, with a mandatory minimum term of one year, to be served concurrently with any other sentence he may be

---

[1] HRS § 712-1240.8 provides in relevant part:

(1) A person commits the offense of methamphetamine trafficking in the second degree if the person knowingly distributes methamphetamine in any amount.

[2] The Honorable Colette Y. Garibaldi presided.

required to serve.   The Circuit Court entered its Judgment on August 22, 2012.

On appeal, Subia contends that: (1) the Circuit Court abused its discretion in permitting an expert to testify that the substances she examined contained methamphetamine because an insufficient foundation was laid for the results of the three tests on which she relied; (2) without the expert's testimony, there was insufficient evidence to prove that the substances Subia provided to the undercover officer contained methamphetamine; and (3) the Circuit Court abused its discretion in permitting the State to ask Subia whether he had worked with the drug supplier before in cross-examining him about his procuring agent defense.   We affirm.

BACKGROUND

I.

An officer of the Narcotic Vice Division of the Honolulu Police Department (HPD), working in an undercover capacity (Undercover Officer), was assigned to a "buy-bust" operation in the Chinatown area.   At trial the Undercover Officer described his encounter with Subia as follows:

> Well, I approached him.   I asked him if "You get," which is, through my training and appearance [sic], is street vernacular to see if you have any illegal drugs to sell.   He said, "What you looking for?"   I said "Clear." Which is street vernacular for crystal methamphetamine.   He said, "How much you looking for?"   I said "Forty."   Forty dollars. He said, "Okay, wait here."

Subia then rode away on his bicycle.   A "[c]ouple minutes" later, Subia returned.   Subia handed the Undercover Officer two small zip-lock bags that contained a white crystalline-like substance, which resembled crystal methamphetamine.   After receiving the two bags, the Undercover Officer gave Subia forty dollars.

The substances in the small bags that the Undercover Officer received from Subia were subsequently analyzed by Jeanette Ardiente (Ardiente), a criminalist with HPD.   Ardiente was qualified as an expert in the field of drug analysis and

2

identification. Ardiente performed three tests to determine whether the substance in each bag contained a controlled substance. These tests were: (1) a color test; (2) a crystal test; and (3) a Fourier Transform Infrared Spectrometer (FTIR) instrument test. The three tests all showed that both bags contained methamphetamine.

II.

Subia raised the procuring agent defense at trial.[3] Subia acknowledged that he had engaged in a drug transaction that involved the Undercover Officer. Subia claimed, however, that he was acting as the agent of the buyer (the Undercover Officer) in the transaction and that he was not the supplier of the drugs or working as an agent for the drug supplier. Based on this claim, Subia argued that he could not be found guilty of distributing methamphetamine, but could only be found guilty of possessing methamphetamine as the agent of the buyer.

Subia testified that when the Undercover Officer said he wanted to buy "[c]lear," Subia understood that the Undercover Officer wanted to buy crystal methamphetamine. According to Subia, he rode his bike and got the drugs from "Tony," who Subia knew sold drugs. Subia testified that he got the drugs from Tony, rode back to where the Undercover Officer was waiting, gave the drugs to the Undercover Officer in exchange for forty dollars, then went back to Tony and gave Tony the forty dollars.

Subia denied working for Tony or receiving anything for his participation in the transaction. Although Subia had never met the Undercover Officer before, Subia testified that he acted purely to help the Undercover Officer get the drugs. When asked why he did not just tell the Undercover Officer to go see Tony himself, Subia testified that he "wasn't thinking at that time."

_____

[3] "[U]nder the procuring agent defense, one who acts merely as a procuring agent for the buyer is a principal in the purchase, not the sale, and, therefore, can be held liable only to the extent that the purchaser is held liable." State v. Davalos, 113 Hawai'i 385, 387, 153 P.3d 456, 458 (2007) (internal quotation marks and citation omitted).

3

DISCUSSION

I.

Subia contends that the Circuit Court abused its discretion in permitting Ardiente's expert testimony that the substances she examined contained methamphetamine. Subia contends that the State failed to lay a sufficient foundation to admit the results of each of the three different tests Ardiente performed in her analysis, and therefore, Ardiente's expert testimony, which was based on the test results, should not have been permitted. We conclude that the Circuit Court properly admitted Ardiente's expert testimony.

"Whether expert testimony should be admitted at trial rests within the sound discretion of the trial court and will not be overturned unless there is a clear abuse of discretion." State v. Montalbo, 73 Haw. 130, 140-41, 828 P.2d 1274, 1281 (1992). Where an expert relies on a scientific test result, a proper foundation for the introduction of the scientific test result can be established by a showing that: (1) the expert is qualified; (2) the expert employed valid techniques to obtain the test result; and (3) the measuring instrument was in proper working order. See State v. Long, 98 Hawai'i 348, 355, 48 P.3d 595, 602 (2002).

A.

At trial, Ardiente testified that she had been a criminalist with the HPD for five years and was responsible for analyzing evidence for the presence of controlled substances. The HPD laboratory where Ardiente performs drug analysis is an accredited laboratory. Ardiente serves as the technical coordinator and manages the quality assurance program for the drug analysis unit that is necessary to maintain the laboratory's accreditation. After describing her education, training, and experience, Ardiente was qualified without objection as an expert in the field of drug analysis and identification. Ardiente analyzed the substances in the two bags that the Undercover Officer had received from Subia. She used three tests in her

4

analysis: (1) a color test; (2) a crystal test; and (3) and an instrument test with the FTIR.

For the color test, Ardiente added a marquis reagent to the sample being tested. The color test is a presumptive test which indicates the presence of methamphetamine, but does not confirm the presence of methamphetamine. If the marquis reagent turns from orange to brown, this indicates the presence of methamphetamine. Ardiente performed the color test on samples taken from the bags recovered in this case. She testified that the test results indicated the presence of methamphetamine for the substances in both bags.

With respect to the crystal test, Ardiente explained that gold chloride with phosphoric acid is added to the sample being tested. If methamphetamine is present, distinctive crystals will form which can be seen with the use of a microscope. Ardiente testified that the results of the crystal test she performed on samples from both bags were that "crystals indicative of methamphetamine were present."

With respect to the instrument test using the FTIR, Ardiente testified that the FTIR test was confirmatory in that "it can identify a particular substance, to the exclusion of all others, within a reasonable degree of scientific certainty." Ardiente explained that in performing the FTIR test, "you place a substance on the instrument. It shines a beam of infrared light on the substance. The molecules vibrate. And the instrument reads those vibration patterns and creates a graph. And that graph is unique to that substance, kind of like a fingerprint." Ardiente compared the graphs created by running samples from the bags through the FTIR with a known graph of methamphetamine run on the same instrument. She testified that the results of her comparison of the graphs were that samples from both bags "were positive for methamphetamine."

Ardiente was then asked about her familiarity with the use of the FTIR. She explained that she was familiar with use of the FTIR based on her training by the manufacturer and an in-

house training course. When asked whether there were procedures or protocols she followed to ensure the FTIR is operating properly, Ardiente stated that the FTIR "has an inbuilt validation program" provided by the manufacturer that will produce a print out stating whether the instrument passed the performance check. The following ensued when Ardiente was asked if she was aware of whether the check to ensure that the FTIR was working properly had been performed on October 4, 2011, the day she analyzed the substances in this case:

> [Deputy Prosecuting Attorney (DPA)]: And are you aware if this check was performed on the FTIR on October 4th, 2011?
>
> [Ardiente:] It was performed. One of the other criminalist performed it. She --
>
> [Defense Counsel]: Your Honor, I have to object then at this point. That would be hearsay.
>
> THE COURT: Sustain.
>
> [DPA]: How do you know the check was performed on the instrument that you used on October 4th, 2011?
>
> [Ardiente]: The printout of the --
>
> [Defense Counsel]: Your Honor, that would be also hearsay objection.
>
> [DPA]: Your Honor, this is all foundational.
>
> THE COURT: Overruled.
>
> [DPA]: Continue.
>
> [Ardiente]: <u>The printout of the performance check is kept. And so that -- to confirm that the instrument is in proper working order, we examine that printout, that says that the instrument -- the performance check has passed. We have to sign off on it to -- or initial it, to say that we did check it and ensure that it was in proper working condition</u>.
>
> [DPA]: And, Miss Ardiente, based on that printout, was the instrument operating in accordance with the manufacturer specifications?
>
> [Ardiente]: Yes.
>
> [Defense Counsel]: Objection, Your Honor. Hearsay. No foundation.
>
> THE COURT: Overruled.

[DPA]:   Your answer?

[Ardiente]:   According to the printout provided by the computer, it was working in proper -- it was in proper working condition.

(Emphasis added.)

Thereafter, Ardiente testified that the FTIR and its self-check test were commonly known throughout the scientific community to be reliable and accurate in confirming the presence of methamphetamine; that on October 4, 2011, the FTIR was operating properly; and that she would not have used the FTIR if it was not working properly.  Ardiente also testified that (1) the results of the FTIR analysis were that samples from both bags testified positive for methamphetamine; and (2) based on all the tests, she concluded that the substances in both bags contained methamphetamine.  The Circuit Court then recessed the trial for the day.

When trial resumed the following day, the Deputy Prosecuting Attorney (DPA) again asked Ardiente to state the results of the tests she had performed on the substances in the bags.  At this point, defense counsel asked to voir dire Ardiente.  During this voir dire, Ardiente explained that the marquis reagent used for the color test is checked with positive and negative controls by the criminalist who made up the marquis reagent.  The laboratory had a ten-day expiration for the use of the marquis reagent.  Ardiente did not recall who made up the marquis reagent used in this case, but indicated she could obtain that information by checking her notes.

With respect to the gold chloride and phosphoric acid reagent used in the crystal test, Ardiente testified that as part of her duties as technical coordinator, she performed quarterly checks on the reagents, including the reagent used in the crystal test, using positive and negative controls, to ensure they were working properly.  The quarterly check for the reagent used for the analysis in this case was done in July.  Ardiente explained that if there is a contaminant present in the reagent for the

7

crystal test, there would be a visible reaction you can see -- precipitate would form and the solution would be cloudy. To ensure that the reagent used for the analysis in this case was not contaminated, she looked at the eye dropper to see if any precipitate had formed.

With respect to the FTIR test, Ardiente explained that the performance check to ensure the FTIR was working properly was done each day, before the FTIR was used, by the first criminalist in for the day. She was not the first criminalist in on October 4, 2011, but reviewed the results of the performance check that had been printed out before using the FTIR on that date.

After concluding his voir dire, defense counsel objected to Ardiente's testimony regarding the "calibration test for accuracy" as to hearsay and lack of foundation, and he based his objections on Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009). Defense counsel also moved to strike Ardiente's testimony and objected to her testifying about the results of the three tests she performed in analyzing the samples. The Circuit Court overruled defense counsel's objection, stating:

> Going to overrule the objection. Miss Ardiente has testified foundationally that she's been trained in and received training from the manufacturer of the FTIR, and that they followed the requirements to determine whether the FTIR is working properly, and also in her capacity I guess as quality control, quality control. She found that it was to be in working -- proper working order, despite the fact that she was not the person who performed those checks.

Ardiente then testified that (1) she followed all the procedures and protocols as she had been trained to do in analyzing the evidence for this case; (2) she had no reason to believe that there were contaminants in the eye droppers used for the color and crystal tests; and (3) she had no reason to believe that the FTIR was not working accurately. Ardiente then repeated her testimony that based on the tests she performed, she concluded that "the substance contained methamphetamine."

B.

Subia argues that because Ardiente did not personally perform the daily performance check on the FTIR before she used

8

it to examine the substances in this case, an insufficient foundation had been laid for the results of the FTIR test. We disagree.

Ardiente testified that the HPD laboratory followed an established procedure and protocol to verify that the FTIR she used was in proper working condition, which incorporated the "performance check" and "an inbuilt validation program" provided by the manufacturer. As part of its established protocol, the first criminalist in the laboratory each day was responsible for running the performance check/validation program on the FTIR to ensure that it was in proper working order. Ardiente testified that before using the FTIR to perform the analysis in this case, she checked the print out from the performance check conducted that day to ensure the FTIR was in proper working order. She further testified that the FTIR and its performance check were known throughout the scientific community to be reliable and accurate in confirming the presence of methamphetamine; that the FTIR she used to examine the samples in this case was operating properly; and that she would not have used the FTIR if it was not working properly.

In State v. Manewa, 115 Hawai'i 343, 167 P.3d 336 (2007), the Hawai'i Supreme Court held that virtually the same foundation as provided in Subia's case was sufficient to admit the results of a test using a gas chromatograph mass spectrometer (GCMS), an instrument the HPD laboratory used as an alternative to the FTIR to confirm the presence of methamphetamine. In Manewa, HPD criminalist Hassan Mohammed (Mohammed) testified on cross-examination in relevant part as follows:

> Q. So basically you can operate these machines, correct, but you cannot maintain it; correct?
>
> A. I wouldn't be able to service them but I do -- I have been trained to ensure that the GCMS and FTIR are in working condition.
>
> Q. So that you can ensure that you can use them; correct?
>
> A. That it's in proper working condition for my purpose.

> Q. Proper working condition, you can start it up, take readouts from it; correct?
>
> A. <u>Yes. We have a routine procedure for the GCMS, if I may explain. Each and every morning before any chemist uses one of several GCMSs, we do a routine check on them to ensure that all the parameters are within the manufacturer specification</u>.
>
> Q. Okay.
>
> A. And we record those as such and if it is not, we don't use it.
>
> Q. I'm sorry, if it is not?
>
> A. If it is not, if any parameter is out of spec, we do not use it until it's rectified.

<u>Manewa</u>, 115 Hawai'i at 348, 167 P.3d at 341 (some emphasis omitted).

Based on this testimony, the supreme court held that a sufficient foundation for the admission of the results of the GCMS tests had been laid:

> Mohammed was qualified as an expert in drug analysis and identification. According to Petitioner's application for certiorari, Mohammed used the GCMS to identify the crystalline substances recovered as methamphetamine. Mohammed testified that "a routine check" was done of the GCMS "each and every morning" "to ensure that all the parameters are within manufacturer specifications." Mohammed related "if any parameter is out of spec, we do not use it until it is rectified." Thus, the record indicates that there was an established manufacturer's procedure that could be conducted by the user to ensure that the GCMSs were in working order according to the manufacturer's specifications.
>
> Because the evidence indicated the GCMSs were operating "within the manufacturer specification(s)," under this procedure Mohammed's own testimony supported the conclusion that the GCMSs were in proper working order at the time the evidence was tested. Therefore, Mohammed's assertion on cross-examination that "I do have personal knowledge because I would not have used any of the instruments if they were not in proper working condition in that particular days," [sic] is consistent with the "personal knowledge" necessary to establish that the GCMSs were in proper working condition. Based on the foregoing analysis, a proper foundation for the identity of the crystalline substances was laid. Consequently, the court did not abuse its discretion in allowing Mohammed to testify as to the identity of the crystalline substances.

<u>Id.</u> at 354, 167 P.3d at 347 (footnote and citation omitted; "[sic]" in original).

10

Based on Manewa, we conclude that Subia's contention that the foundation for the FTIR test was deficient because Ardiente did not personally perform the daily performance check before using the instrument is without merit. Indeed in Manewa, the supreme court did not cite to any testimony that Mohammed *himself* had performed the daily routine check of the GCMC before using it; rather it was Mohammed's knowledge that the laboratory followed a routine procedure to ensure that the GCMC was in proper working order that was important. Manewa establishes that testimony showing compliance with established procedures that provide assurance that the instrument is in proper working order is sufficient to lay the foundation for admission of the results of the instrument's use. As in Manewa, Ardiente's testimony indicated that an established daily procedure, of which she had personal knowledge, to run a performance check provided by the manufacturer to ensure that the FTIR was in good working order had been followed. Accordingly, we conclude that the State laid a sufficient foundation for the admission of the FTIR results.

C.

We reject Subia's contention that his confrontation rights were violated by Ardiente's reference to the performance check of the FTIR, which was conducted by another person, to show that the FTIR was in proper working order. The evidence related to the performance check was not testimonial and therefore did not implicate Subia's confrontation rights. See Melendez-Diaz v. Massachusetts, 557 U.S. 305, 311 n. 1 (2009) ("[W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case. . . . [D]ocuments prepared in the regular course of equipment maintenance may well qualify as nontestimonial records." (emphasis added)); State v. Fitzwater, 122 Hawai'i 354, 373-74, 227 P.3d 520, 539-40 (2010) (concluding that a speed check card created to verify that a police car's speedometer was in proper working order is

11

nontestimonial in nature); State v. Marshall, 114 Hawai'i 396, 401-02, 163 P.3d 199, 204-05 (App. 2007) (holding that an Intoxilyzer supervisor's sworn statements establishing that the Intoxilyzer used had been properly calibrated and tested for accuracy were not testimonial).

Subia's reliance on Melendez-Diaz is misplaced. In Melendez-Diaz, 557 U.S. at 307-11, the Court held that the defendant's confrontation rights were violated when affidavits reporting the results of forensic drug analysis were admitted in evidence without the analysts testifying at trial or being subject to cross-examination. Here, unlike in Melendez-Diaz, Ardiente, the criminalist who performed the drug analysis, testified at trial and was subject to cross-examination. Subia's confrontation rights were not violated.

D.

Because the FTIR "can identify a particular substance, to the exclusion of all others, within a reasonable degree of scientific certainty[,]" our conclusion that the FTIR test results were properly admitted would appear to be sufficient to reject Subia challenge to Ardiente's testimony that the substances she analyzed contained methamphetamine. In any event, we conclude that a proper foundation was laid, and the Circuit Court did not abuse its discretion, in admitting the results of the color and crystal tests. Ardiente's testimony showed that the laboratory had established procedures for ensuring the purity of the reagents used in these tests and that those procedures had been followed, with no signs of contamination. The fact that all three tests were consistent and were positive for the presence of methamphetamine, as well as Subia's testimony that he had been involved in a methamphetamine transaction, also supports the reliability of the test results.

E.

Based on the foregoing, we conclude that a proper foundation was laid for admission of the results of the FTIR,

color, and crystal tests. Accordingly, the Circuit Court did not abuse its discretion in admitting the test results and Ardiente's expert testimony that the substances she analyzed contained methamphetamine. Because Ardiente's expert testimony was properly admitted, Subia's contention that there was insufficient evidence to prove that the substances Subia provided to the Undercover Officer contained methamphetamine necessarily fails.

II.

Subia contends that the Circuit Court abused its discretion in permitting the State, in cross-examining Subia about his procuring agent defense, to ask Subia whether he had worked with Tony (the purported drug supplier) before. We disagree.

A.

At trial, Subia relied on the procuring agent defense, which provides that "one who acts merely as a procuring agent for the buyer is a principal in the purchase, not the sale, and, therefore, can be held liable only to the extent that the purchaser is held liable." State v. Davalos, 113 Hawai'i 385, 387, 153 P.3d 456, 458 (2007) (internal quotation marks and citation omitted). The procuring agent defense is negated if the jury finds that the defendant acted, in whole or in part, on behalf of the seller. See State v. Balanza, 93 Hawai'i 279, 285, 287, 1 P.3d 281, 287, 289 (2000).

On direct examination, Subia testified that the Undercover Officer approached him and asked if Subia had any drugs. Subia said, "no," but Subia testified that because Subia wanted to help the Undercover Officer, Subia told him that Subia could get him some drugs from someone else. According to Subia, he rode his bike to Tony's tent, because he knew Tony sold drugs. Tony gave Subia drugs. Subia then took the drugs to the Undercover Officer, who gave Subia $40, which Subia took back to Tony. Subia denied that he was working for Tony and denied that he received anything from Tony for his role in the transaction:

> [Defense counsel] Q  . . . Were you working for Tony?
>
> A  No, no.  I just was helping the officer to get the drugs.
>
> Q  Okay.  Why didn't you just tell the officer go where Tony was?
>
> A  I --
>
> Q  What's that?
>
> A  I wasn't thinking that time, you know.
>
> Q  Okay.
>
> A  Just want to help him.
>
> Q  Okay.  And then when you -- the forty dollars, you gave that to Tony?
>
> A  Yes.
>
> Q  Did Tony give you any?
>
> A  No.
>
> Q  Any of the forty dollars?
>
> A  No.
>
> Q  Did Tony give you any drugs for what you did?
>
> A  No. No.

On cross-examination, Subia stated that Subia did not know that the Undercover Officer was a police officer and thought he was just someone who wanted drugs.  Subia also acknowledged that he knew that the Undercover Officer was asking for crystal methamphetamine when the Undercover Officer used the term "clear."  The DPA cross-examined Subia about his relationship with Tony and his version of his interaction with Tony during the transaction:

> Q  Now, you said you went to see Tony.
>
> A  Yes.
>
> Q  But you didn't tell [the Undercover Officer] to go around the corner and go see Tony for the drugs, yeah?
>
> A  Well, I told him wait, I'm gonna go get the drugs.
>
> Q  But you could have just told the officer go.  Go. Go see Tony.
>
> A  I wasn't thinking at that time.

14

Q   Then you went to see Tony.   And what you told Tony?

A   Yes.   Somebody want to buy forty, forty dollar worth.

Q   Of crystal meth?

A   Crystal meth.

Q   And he believed you?

A   Yeah.

Q   And then he gave you the drugs?

A   Yeah.

Q   He gave you the drugs.   But you never give him money.

A   What he gave me the drugs for, because the officer had forty dollars.   So I wen go over there and when he wanted forty.

Q   He gave you the drugs because he believed you, right?

A   Yeah.

Q   He trusts you?

A   Yes.

Q   You did this before?

A   Yeah, some.

[Defense counsel]:   Your Honor, objection.   Relevance.

THE COURT:   I'll allow it.   Overruled.

BY [DPA]

Q   You did this before?   You was working for Tony then before?

A   No.

Q   No?

A   (Shakes head.)

Q   Right, right.   You want us to believe that you was helping out.

A   Yeah, I just was helping out the -- helping them two guys out.

Q   Complete stranger.   You never met [the Undercover Officer] before.

A   No.

Q    Just want to help him out.

A    Yeah.

Q    Tony never asked you for go out and look for people who like buy?

A    No. I don't do that.

Q    No.  So you not surprised when somebody comes up to you and goes oh, I like buy meth.  It's happened before, that's why.

[Defense Counsel]: Your Honor, again, objection. Relevance.

THE COURT: Overruled.

[DPA]:  No further questions, Your Honor.

B.

We conclude that Subia's testimony on direct examination that he was not working for Tony, did not receive anything from Tony for participating in the drug transaction, and just wanted to help the Undercover Officer opened the door to the DPA's cross-examination.  See State v. McElroy, 105 Hawai'i 352, 357, 97 P.3d 1004, 1009 (2004) (citing Bobb v. United States, 758 A.2d 958, 963 (D.C. 2000) ("When a defendant testifies to certain facts or issues during his direct examination, he opens the door to further inquiry into those matters on cross-examination." (brackets, internal quotation marks, and citation omitted)); State v. Kazanas, 134 Hawai'i 117, 129, 336 P.3d 217, 229 (App. 2014) (concluding that the defendant's testimony opened the door to the prosecution's introduction of conflicting evidence), cert. granted, No. SCWC-12-0001011, 2015 WL 769849 (Feb. 23, 2015). Subia's version of events, particularly Tony's providing the methamphetamine to Subia without first requiring payment and the purely altruistic motive claimed by Subia for participating in the drug transaction, opened the door to the DPA's questioning Subia about his relationship with Tony, why Tony would trust him, and whether Subia had ever "[done] this before."

The DPA's cross-examination was clearly relevant to impeaching Subia's version of events and to rebutting Subia's

procuring agent defense. The DPA's cross-examination offered evidence for a proper purpose -- to show that Subia's intent, motive, and role in the transaction was to assist the seller, and not solely to help the buyer. See Hawaii Rules of Evidence (HRE) Rule 404(b) (Supp. 2014). It was proper for the DPA to question why Tony, a drug dealer, would trust Subia with drugs without first requiring payment unless there was a basis for that trust, namely, that Subia had worked with Tony before or was receiving some compensation from Tony for his role in brokering the transaction.

We reject Subia's claim that the Circuit Court violated HRE Rule 404(b) in permitting the DPA's cross-examination. See McElroy, 105 Hawai'i at 356-57, 97 P.3d at 1008-09 (holding that it was not prosecutorial misconduct for the prosecutor to question the defendant to develop an issue that the defendant himself broached); State v. Acker, 133 Hawai'i 253, 276-78, 327 P.3d 931, 954-56 (2014) (concluding that "bad act" evidence was admissible under HRE Rule 404(b) to rebut the defendant's theory of defense); State v. Culbreath, 659 S.E.2d 268, 272 (S.C. Ct. App. 2008) ("[A] defendant may open the door to what would be otherwise improper evidence through his own introduction of evidence or witness examination."). In any event, Subia did not object on HRE Rule 404(b) grounds at trial, but only objected on the grounds of relevancy. Accordingly, he did not preserve his HRE Rule 404(b) claim for appeal. See State v. Matias, 57 Haw. 96, 101, 550 P.2d 900, 904 (1976) ("[T]here can be no doubt that the making of an objection upon a specific ground is a waiver of all other objections." (internal quotation marks and citation omitted.)); State v. Vliet, 91 Hawai'i 288, 298-99, 983 P.2d 189, 199-200 (1999) (concluding that the defendant's objection on a particular ground that was properly overruled at trial waived his claim of error on appeal on a different ground that was not raised at trial).

CONCLUSION

Based on the foregoing, we affirm the Circuit Court's Judgment.

DATED:  Honolulu, Hawai'i, August 17, 2015.

On the briefs:

Summer M.M. Kupau
Deputy Public Defender
for Defendant-Appellant

Brandon H. Ito
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee

Chief Judge

Associate Judge

Associate Judge

18